HELEN M. WHITE v. NORTHWESTERN BANK BUILDING COMPANY.
W. S. NOTT COMPANY, THIRD-PARTY DEFENDANT.
PAGE BELTING COMPANY, FOURTH-PARTY DEFENDANT.

160 N. W. (2d) 545.

July 19, 1968—No. 40,465.

*Carroll, Cronan, Roth & Austin* and *Frank X. Cronan,* for appellant.
*Dorfman & Rudquist* and *John P. Karalis,* for plaintiff respondent.
*Richards, Montgomery, Cobb & Bassford, Greer E. Lockhart,* and *Vincent E. Platt,* for respondent W. S. Nott Company.
*Mackall, Crounse, Moore, Helmey & Holmes* and *Connor F. Schmid,* for respondent Page Belting Company.

PETERSON, JUSTICE.

Plaintiff, Helen M. White, was injured in a fall upon a mat located in an entryway of the Northwestern National Bank, a building in downtown Minneapolis owned by defendant, Northwestern Bank Building Company (hereafter "the bank"). A jury in Hennepin County District Court returned a verdict for plaintiff. Defendant moved for judgment notwithstanding the verdict or for a new trial and appeals from the order denying its motion.

One of three entryways to the lobby of the bank is located at Seventh Street, just off Marquette Avenue. It is an open entryway, unheated and

exposed to the elements. Because it is constructed of marble and slopes slightly toward the public sidewalk immediately adjacent to it, an obvious danger to pedestrians of slipping and falling would exist if ice, snow, or other moisture were to accumulate upon it. The bank, accordingly, had installed and maintained a leather mat over essentially the entire entryway, from the sidewalk to the point where various revolving doors provide entry into the large interior lobby. This mat is in place each year from November through early spring. In addition to space used by the banking business, there are a few commercial tenants on the main floor and numerous office tenants on the upper floors of this large building. By mutual arrangement between the bank and Donaldson's, a large department store adjacent to it, an entry leads from the interior lobby to the department store. Customer counts conducted by the bank establish that in 1958 some 10,000 persons passed through this mat-covered entryway daily and on some days as many as 15,000; like numbers of persons used the other two entryways to the bank.

Plaintiff's claim of actionable negligence is based on the allegation that the bank placed and maintained a "defective, dangerous, and hazardous floor mat" upon the entryway floor. The mats covering this and the other entryways to the bank were designed and fitted for those entryways for the express purpose of preventing pedestrians from slipping and falling on the marble floor.[1] The design and use of these mats was common in various other public buildings in Minneapolis and elsewhere. They were of leather link construction, with a corrugated surface, and lay flat on the floor surface. The mats were ⅝ of an inch thick and were engineered with interstices "about a half-inch by five-eighths or three-quarters," the express purpose of which was to permit the drainage of snow and moisture and to prevent formation of a slippery surface.

---

[1] The mat was ordered through W. S. Nott Company, Minneapolis, from the manufacturer, Page Belting Company, third- and fourth-party defendants, respectively. The trial court dismissed as to third-party defendant. Because fourth-party defendant had been brought in by third-party defendant, rather than by defendant bank, the dismissal as to it was automatic. Our disposition of the case requires no consideration of any issue as to such dismissals.

Plaintiff, a woman 54 years of age, used this entryway almost daily over a period of 8 to 10 years, either to do business at the bank or at Donaldson's. At about noon on January 16, 1958, she used it to go to and from Donaldson's, her place of employment being in the Investors Building located across the street from the bank. She was wearing shoes with a high heel. The height of the heel was approximately 2½ inches. The bottom of the heel was rounded in the back and approximately ½ inch in diameter. The shoe was a dress shoe of moderate fashion at the time, but narrower heels up to 3 inches in height were not uncommon. As plaintiff proceeded across the entryway on her return route to her office, her heel became wedged in one of the interstices in the mat, as a result of which she fell and sustained injury.[2]

The sole issue boils down to whether defendant was negligent in maintaining a mat containing interstices of this size rather than spaces of even smaller size and shape, or no spaces at all. There is no evidence that the bank was aware of any persons having fallen as a result of stepping into the interstices in the mat.[3] Mats of identical design had been maintained in these entryways for 23 years and had most recently been replaced in 1954, at a cost of $5,155. But for the existence of the "holes," there is no other claim of defective conditions in the entryway. The mat was clean and in good repair; there was no moisture or foreign matter on the mat; the mat lay flat.

The well-settled rule concerning the obligation of defendant, as a shop-keeper, to plaintiff, as an invitee, is undisputed: The bank is not an insurer of the safety of the plaintiff but does owe her the duty of reasonable care to maintain its premises in a safe condition.[4] The real ques-

---

[2] Plaintiff had owned these shoes for several months. She testified that some time before this fall, one of these same shoes had become caught in an escalator in another large downtown department store but it resulted in no fall.

[3] Two women, one known to plaintiff and one to her attorney, testified to having caught their heels in the mat, but they had not communicated these occurrences to the bank. Any suggestion that others may have fallen and that bank guards or other bank employees may have been aware of it would be sheer speculation.

[4] Ober v. The Golden Rule, 146 Minn. 347, 178 N. W. 586; Schrader v.

tion, rather, is whether reasonable care requires the bank to maintain a "heel-proof" mat. Stated differently, does a jury verdict against the bank based only upon a showing that plaintiff fell because she stepped into a mat hole have the effect of making the bank an insurer of her safety?

We hold that plaintiff has not established a case of actionable negligence against defendant, and that a jury verdict, based only upon the undoubted fact that plaintiff wedged her heel into a functional space in the mat, is insufficient to support the verdict against defendant.[5] The controlling principle of commonsense as stated in Mattson v. St. Luke's Hospital, 252 Minn. 230, 233, 89 N. W. (2d) 743, 745, 71 A. L. R. (2d) 422, 425, is that "[t]he exercise of reasonable care for the safety of invitees requires neither the impossible nor the impractical." Winter snow and ice are realities of Minnesota life with which one must cope but against which he cannot insure. Had defendant installed no mat or other device to protect pedestrians from slipping upon its surface, which ice and snow would obviously make hazardous, its negligence could hardly be doubted. Had it installed a mat upon which ice and snow could gather and compact into an equally slippery surface, its negligence would be equally apparent. Yet, were it to have installed a mat either without interstices or with interstices too small to create adequate drainage, that would have been virtually the inescapable result. But were it to have

---

Kriesel, 232 Minn. 238, 45 N. W. (2d) 395; Behrendt v. Ahlstrand, 264 Minn. 10, 118 N. W. (2d) 27; Wolvert v. Gustafson, 275 Minn. 239, 146 N. W. (2d) 172.

[5] The trial court in denying defendant's motion stated: "The court was aware of the legal doubt that exists as to liability and of the dearth of support for the plaintiff's position it has found in the cases. The only two that counsel and the court are aware of, however, are the following: *Ramsey v. Mellon National & Trust Company* (W. D. Pa.) 231 F. Supp. 1; *Blumberg v. M. & T. Inc.* 34 Cal. (2d) 226, 209 P. (2d) 1.

"This case is somewhat distinguishable from other mat cases in that the mat in question covered the entire entryway and was somewhat of the same type of thing as if there were no mat and the holes themselves were actually a part of the floor. *No matter what position the court had taken this case would have been appealed unless the jury had made it unnecessary and the court accordingly left the entire matter go to the jury.*" (Italics supplied.)

installed a mat with interstices large enough both to create complete drainage and to avoid wedging of heels of any common size worn by women, such spaces probably would have created a surface into which women's toes would stumble. It would be impractical and unrealistic to require in effect that the interstices in these mats must be re-engineered simultaneously with the changing fashions of women's footwear, particularly where there is no assurance that upwards of 15,000 women on any given day would wear shoes of the same fashion. The obvious necessities of the situation must be balanced against what, on this record, was a slight risk. Some risk there was that a woman's heel might "go through" the "hole," as defendant's manager acknowledged, but that was not the same as a risk that a heel would become wedged in it and cause a pedestrian to fall and suffer serious injury. And, to the extent that such risk did exist, it seemingly would exist regardless of the shape or dimension of the interstice.

The situation existing as to mats of this kind is not unlike other major installations like cleats in escalators in buildings or storm drains, manholes, and gratings in the public way. It is quite unlike the situation, seemingly suggested by the trial court, which would exist if, *without functional reason,* a floor in an interior lobby were to be constructed with holes in it. Cf. Hastings v. F. W. Woolworth Co. Inc. 189 Minn. 523, 250 N. W. 362; Sumner v. City of Northfield, 96 Minn. 107, 104 N. W. 686.

The precedents in other jurisdictions are, as the trial court noted, few. Plaintiff relies upon Blumberg v. M. & T. Inc. 34 Cal. (2d) 226, 209 P. (2d) 1, and Ramsey v. Mellon Nat. Bank & Trust Co. (W. D. Pa.) 231 F. Supp. 1. Defendant cites Robinson v. Southwestern Bell Tel. Co. 26 Ill. App. (2d) 139, 167 N. E. (2d) 793; Tolman v. Wieboldt Stores, Inc. 73 Ill. App. (2d) 320, 219 N. E. (2d) 560 (but reversed, 38 Ill. [2d] 519, 233 N. E. [2d] 33); McQuillan v. City of New Orleans (La. App.) 18 So. (2d) 218; Erbe v. Maes, 226 Wis. 484, 277 N. W. 111; and Bowerman v. Greenberg, 142 Neb. 721, 7 N. W. (2d) 711. Although the result in the more recent of these cases arguably supports plaintiff's position, we are pursuaded to the opposite result.

The California decision in Blumberg v. M. & T. Inc. *supra,* which is factually in point, illustrates the difference of opinion among those

jurisdictions. Plaintiff fell when her heel became wedged in one of the rectangular openings of a rubber mat placed on the terrazzo floor of the lobby in defendant's building. Plaintiff was wearing a shoe with a medium spike heel of the type worn by more than half of San Francisco's women, the lift of which was approximately seven-eighths of an inch in diameter. No claim was made that the mat, but for the holes, was defective or dangerously constructed. The mat was similar to those generally used in office building lobbies. The majority of a divided court held that reasonable inquiry would have informed the defendant owner that the openings in the mat were likely to grasp the heel of a shoe worn by large numbers of women and that, even though such mats were used by many others, it did not excuse maintaining a dangerous condition or transform a negligent practice into reasonable care. But three judges, led by Mr. Justice Traynor, disagreed on the ground that the mere occurrence of a single accident not otherwise foreseeable would not thereby transform a general practice into a negligent one and, further, that any danger inherent in the mat would be as apparent to the injured plaintiff as to the defendant owner. Mr. Justice Traynor concluded with the pertinent observation (34 Cal. [2d] 233, 209 P. [2d] 6):

"* * * The danger to be anticipated was from the spiked heels, not from the mat. Those who walk on spiked heels court danger. That is their privilege, but it is also their responsibility to consider the consequences, to be aware of the peculiarities of the shoes they wear. [Plaintiff] not only could see everything that defendants could by looking at the mat, over which she had walked when she entered the building, but she knew as they did not the type of heel she was wearing."

We hold that as a matter of law there is no evidence to establish that defendant's installation and maintenance of its entryway mat presented an unreasonable risk of harm to plaintiff. Plaintiff had a most unfortunate accident in which she has suffered a serious injury. We cannot on the ground of sympathy alone, however, permit a verdict to stand that imposes liability on another under circumstances that establish no failure to exercise reasonable care for her safety.

Reversed and judgment ordered for defendant bank.

SHERAN, JUSTICE (dissenting).

■ I dissent on the basis of the following facts reasonably to be inferred from the evidence appearing in the record:

(1) At the time the mat was installed, shoes of the type worn by plaintiff and equipped with heels 2½ inches in height and ½ inch in diameter were in common use by women who had occasion to use the entranceways of the defendant's business premises for a business purpose.

(2) Defendant knew this to be the case at that time.

(3) The interstices of the mat ordered and installed by defendant measured ½ inch x ⅝ inch in diameter and ⅝ inch in depth.

(4) Thirty thousand people daily used the entranceways to defendant's building, all of which were covered by mats of the type here involved. At least one-half of them were women. With shoes of the type here involved in common use by so many, there was a likelihood that some one of them would on some occasion so step as to place her heel directly over one of the interstices. While we do not know the mathematical probability of such an occurrence, the record does tell us that two other women among the necessarily limited number known to plaintiff, had this experience.

(5) If the heel of a shoe ½ inch in diameter is placed on an opening larger than it is and weight is then applied to the heel, it will penetrate the hole and (the depth of the opening being ⅝ of an inch) become wedged in it.

(6) A woman whose heel becomes wedged in a mat is likely to fall and hurt herself.

(7) The harm to be apprehended could have been avoided by the use of a mat as suitable as this one for the purposes intended by the owner of the building with holes ⅛ inch in diameter. Had this been done, the hazard could have been eliminated without excessively burdensome expense.

Upon these facts, a holding that there can be no liability here is inconsistent, in my opinion, with prior decisions of this court (Soper v. Erickson, 172 Minn. 377, 215 N. W. 865; Hastings v. F. W. Woolworth Co. Inc. 189 Minn. 523, 250 N. W. 362; Sumner v. City of Northfield,

96 Minn. 107, 104 N. W. 686; Cogswell v. U.S.S. Yorktown Post 178, 274 Minn. 154, 143 N. W. [2d] 45); a subsisting determination made by the California Supreme Court on almost identical facts (Blumberg v. M. & T. Inc. 34 Cal. [2d] 226, 209 P. [2d] 1); a decision of a Federal district court in Pennsylvania from which no appeal was taken (Ramsey v. Mellon Nat. Bank & Trust Co. [W. D. Pa.] 231 F. Supp. 1) involving the same situation as that here presented; and a most recent decision of the Supreme Court of Illinois (Tolman v. Wieboldt Stores, Inc. 38 Ill. [2d] 519, 233 N. E. [2d] 33) which stands for the proposition that the owner of business premises who invites women there for the purpose of transacting business must anticipate that they will be wearing high-heeled shoes of a type customarily used by ladies.

While those who wear high-heeled shoes must use reasonable care for their own safety, the hazard involved here was sufficiently obscured and the attention of the plaintiff sufficiently distracted to permit the jury to excuse her failure to make the minute examination that would have been required to demonstrate to her that the holes in the mat were slightly larger than the heel of the shoes she was wearing.

Considering the fact that the building here involved is located in the heart of a modern metropolitan retail shopping and business center, the opinion of the majority gives to the occupier of the business premises involved a greater degree of immunity from liability for injury than, in my opinion, it would have asked for itself before the accident occurred. The reasonableness of this statement can be tested by trying to visualize the owners of the Northwestern National Bank of Minneapolis posting a sign in their entranceway reading "Ladies with High-heeled Shoes: Keep Out." If exception be taken to the bluntness of this limitation upon the public's invitation, then try to imagine such a sign reading: "Ladies with High-heeled Shoes: Use This Entranceway at Your Own Risk." I find it impossible to envision such a sign in place for this reason: The economic worth of the business premises involved is enhanced if women wearing shoes with high heels, or low heels, or no heels at all consider themselves equally welcome to make use of the facilities available there without fear of injury.

Or to put the concept to another test: Is it likely that those who de-

termine the management policies of this building would have permitted the initial use or the continued presence of these mats had they in fact visualized the occurrence of an accident of the type here involved? I doubt it seriously. It is no answer to this proposition to say that negligence is not to be determined on the basis of hindsight, at least in this case. In my judgment, reasonably careful consideration of the hazards involved makes the accident which in fact occurred clearly foreseeable without the aid of actual experience, once the proposition that a heel $\frac{1}{2}$ inch in diameter will become wedged in a hole slightly larger than that and $\frac{5}{8}$ of an inch deep is accepted.

Where respected courts from other jurisdictions have affirmed findings of negligence in almost identical situations and we ourselves are not in substantial accord, we should be slow to declare without the support of countervailing authority that reasonable minds should all concur in a finding of nonliability. As stated in Lindgren v. Voge, 260 Minn. 262, 269, 109 N. W. (2d) 754, 759, 88 A. L. R. (2d) 1080:

"*  *  * [W]here the facts are such that fair-minded men of ordinary intelligence may differ as to the inferences to be drawn therefrom, the question of negligence is for the jury. Emery v. Minneapolis Industrial Exposition, 56 Minn. 460, 57 N. W. 1132. See Nicol v. Geitler, 188 Minn. 69, 247 N. W. 8." (Italics supplied.)

■ While I disagree with the decision of the majority, I must concede in fairness that the case is a marginal one on the issue of liability. In such a situation, we should properly be most attentive to the claims of defendant contending that the issue of liability was not decided by the jury on the basis of the evidence. Therefore, while I think that affirmance can be justified here, I could accede without difficulty to a resolution of this case whereby the judgment would be reversed and the plaintiff granted a new trial (a) because of the weakness of the evidence in support of the asserted fact that a mat with interstices $\frac{1}{8}$ of an inch in diameter was available and would have materially reduced the risk of injury without burdensome cost to the defendant, and (b) because a colloquy, which occurred between the jury and the court after the case was submitted and shortly before the verdict was returned, indicates that the

jurors may have based their verdict upon a factual theory having no support in the evidence and urged by neither of the parties. An order granting a new trial would permit the plaintiff to supply the missing evidence if it is available and would enable the court to eliminate the hazard that this case was not decided on the evidence. But if the majority of the court are of the opinion that this is simply a case of no liability, no purpose would be served by directing a new trial.

NELSON, JUSTICE (dissenting).

I join in the dissenting opinion of Mr. Justice Sheran.

MURPHY, JUSTICE (dissenting).

I join in the dissenting opinion of Mr. Justice Sheran.